Jeena Jiampetti, SB# 251075
Email: jeena@benefitslaw.com
Cassie Springer Ayeni, SB# 221506
Email: cassie@benefitslaw.com
**SPRINGER AYENI,**
**A Professional Law Corporation**
4319 Piedmont Avenue, Second Floor
Oakland, CA 94611-4755
Telephone:  510.926.6768
Facsimile:  1.510.926.6768
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### San Francisco / Oakland Division

| | |
|---|---|
| MEIHONG LIN,<br><br>                     Plaintiff,<br>       vs.<br><br>LINCOLN LIFE ASSURANCE<br>COMPANY OF BOSTON,<br><br>                     Defendant. | Case No. 3:21-cv-560<br><br>**COMPLAINT (ERISA)** |

## I.    <u>JURISDICTION AND VENUE</u>

1.      Plaintiff Meihong Lin ("Ms. Lin" or "Plaintiff") brings this action for declaratory, injunctive, and monetary relief pursuant to §§ 502(a)(1)(B) and 502(g) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(g).  This Court has subject matter jurisdiction over Plaintiff's claim under 29 U.S.C. § 1132(e), (f), (g), as it involves a claim by Plaintiff for disability benefits under an employee benefit plan regulated and governed by ERISA.  Jurisdiction is predicated under these code sections as well as 28 U.S.C. §1331, as this action involves a federal question.

2.     On information and belief, Defendant Lincoln Life Assurance Company of Boston ("Lincoln" or "Defendant") is, and at all times herein mentioned has been, licensed to do business in California.

3.     Venue is proper under 29 U.S.C. § 1132(e)(2) because Plaintiff resides in San Mateo County, which is located in this District, and the ERISA-governed plan at issue was administered in part by Defendant in this District.

## II.     INTRADISTRICT ASSIGNMENT

4.     The San Francisco or Oakland Division of this judicial district would be the appropriately assigned division, pursuant to Civil L.R. 3-2, as Plaintiff's permanent residence is in San Mateo County.

## III.     PARTIES

**A. Plaintiff**

5.     Prior to stopping work, Ms. Lin was employed by Leland Stanford Junior University ("Stanford").

6.     At Stanford, Ms. Lin participated in her employer's ERISA benefit plans, including the long-term disability ("LTD") plan sponsored by Stanford ("the Plan") and insured and administered by Defendant.

7.     At all relevant times, Plaintiff was and is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan.

**B. Defendant**

8.     At all relevant times, Defendant insured and administered the Plan.

9.     At all relevant times, Defendant exercised discretionary authority or discretionary control respecting management of the Plan and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

10.    At all relevant times, Defendant was and is a fiduciary of the Plan as defined by ERISA § 3(21), 29 U.S.C. § 1001(21).

## IV.     FACTS

**A. Vocational Background**

11.    Ms. Lin was born, raised, and educated in China.  At university, she studied horticulture and agriculture.

12.    Ms. Lin spent the first 10 years of her career working as the deputy-in-chief of the Hunan Horticultural Association, an institute for the sciences, where she managed about 2000 people throughout Hunan province who worked in horticulture science.

13.    In or around 1995, Ms. Lin, her husband, and their son relocated to Halifax, Canada where Ms. Lin's husband was pursing his PhD.

14.    From approximately 1995 to 1998, Ms. Lin studied and worked in computer science.

15.    After approximately four years in Canada, the Lin family relocated again to the San Francisco Bay Area for Mr. Lin's work.

16.    Upon moving to the United States, Ms. Lin worked as web engineer for several years before being hired as a research assistant at a Palo Alto hospital.

17.    In or around 2004, after working at the hospital for approximately 2 years, Ms. Lin was hired by Stanford University as a Lab Manger in the Dermatology department.

18.    The lab Ms. Lin managed was used by students and faculty to conduct research.

19.    As the Lab Manger, Ms. Lin was in charge of organizing, managing, and maintaining the lab.  She was also required to collaborate with the principal investigator and his team to plan and execute experiments related to cancer and genetic diseases.

20.    Approximately one third of Ms. Lin's time was spent assisting graduate and post-doctoral students with their research projects, including troubleshooting their experiments.

21.    Ms. Lin's job also required her to work independently to determine the appropriate timing and implementation of experiments.

22.     The Lab Manger position was very demanding; Ms. Lin was responsible for offering input on technical aspects of colleagues' experiments, suggesting possible angles and approaches to experiments and data interpretations, isolating patient cells key to lab experiments, and teaching protocols in cell culture, microscopy, immunofluorescence, and chromatography.  The position required excellent lab techniques, a B.S. degree with coursework in molecular biology and biochemistry, and significant laboratory research experience.

23.     Ms. Lin stayed in her position at Stanford for over a decade before her medical conditions rendered her unable to do her job.

**B. Medical History**

24.     After working in the lab for many years, Ms. Lin noticed that she would sometimes feel dizzy and get a headache when she worked in the lab.

25.     Ms. Lin tried to ignore her intermittent symptoms for years, but in or around 2015, her headaches intensified and became almost constant.

26.     Ms. Lin went to the occupational health clinic at Stanford and followed up with other doctors in an attempt to treat her headaches.

27.     Initially, Ms. Lin's symptoms would improve if she was not inside the lab, so she attempted to limit her time there, but she could not avoid the lab entirely since it was her job to run the lab.

28.     The cause of Ms. Lin's headaches was unclear, but she did observe that people in the lab often did not perform their work under a hood—as was required when working with chemicals—and she was exposed to chemical smells all day long, year after year.

29.     Ms. Lin also started to experience neck pain, which became worse when working at a computer, and her job required her to spend a lot of time on the computer.

30.    Ms. Lin had "cycles" where her symptoms would improve and then get worse again, but she was able to manage her condition and continue working without significant interference until approximately November 2016.

31.    In or around November 2016, Ms. Lin was unable to perform job duties in the lab for more than 10 minutes before her symptoms became unbearable.

32.    Ms. Lin continued working until in or around the spring of 2017 by avoiding time in the lab.

33.    Unfortunately, Ms. Lin's employer terminated her because being in the lab was an essential part of Ms. Lin's job and she had become unable to spend sufficient time in the lab.

34.    At the time she stopped working, Ms. Lin's headaches were virtually constant.  The headaches were severe and persisted even though she was no longer working in the lab and exposed to chemical inhalation.  On one occasion, Ms. Lin had a headache that was so painful she had to be taken by ambulance to the emergency room.

35.    Although Ms. Lin now has a near-constant headache that ranges in intensity from 6/10 to 8/10 on the pain scale, there are many triggers than can increase her pain, including noise, talking, bright lights, stress, and lack of sleep— which is difficult control because Ms. Lin's sleep is often interrupted by pain.

36.    Ms. Lin's headaches and precautions to avoid exacerbating headache pain are extremely limiting.

37.    In addition to severe headaches, Ms. Lin continues to experience neck pain even though she is no longer regularly using a computer.  As with her headaches, the neck pain limits her activities.

38.    Most of Ms. Lin's days are spent on the couch or in bed resting or sleeping.  On days when she does not get sufficient rest, her headaches get much worse and there are some mornings where she needs to stay in bed for several hours before she can get up.

39.     Ms. Lin relies on her husband to perform most of the household duties, including shopping, cooking, and chores.

40.     Generally, Ms. Lin is unable to tolerate watching television, being on the computer, and riding in the car for extended periods of time.

41.     Although she sometimes takes a walk outside to get fresh air, she's no longer able to do the activities she once enjoyed, such as hiking, playing ping pong, traveling, and socializing with family and friends.

42.     Ms. Lin's diagnoses include: headache, chronic headache with migrainous features, cervicogenic headaches, myofascial pain syndrome, cervical strain, cervical disc displacement, cervical sprain/strain, cervicalgia with associated cephalgia, thoracalgia, bilateral shoulder tenosynovitis, cervical subluxation, cervical intervertebral disc disorder, brachial radiculitis/neuritis, and myalgia.

43.     On information and belief, a cervicogenic headache is a secondary headache or referred pain caused by problems with the neck.

44.     On information and belief, myofascial pain syndrome is a chronic pain disorder characterized by deep, aching pain in a muscle that persists or worsens and can cause among other issues, difficulty sleeping.

45.     On information and belief, tenosynovitis is inflammation of a tendon and the tendon sheath lining.

46.     On information and belief, subluxation is the partial dislocation of the spine.

47.     On information and belief, brachial neuritis involves pain or loss of function in the nerves that carry signals from the brain to the chest, shoulder, arm, and hand.

48.     Ms. Lin's primary treatment provider is a physical medicine and rehabilitation specialist who has documented numerous physical findings during his routine examinations, including spasms and tenderness in the trapezius and

paraspinous regions, decreased cervical range of motion, positive bilateral Tinel's sign, and positive bilateral Phalen's sign.

49.     On information and belief, the Tinel's sign test is typically used to diagnose carpal tunnel syndrome, cubital tunnel syndrome, or tarsal tunnel syndrome.

50.     On information and belief, the Phalen's sign test is typically used to help diagnose carpal tunnel syndrome.

51.     Ms. Lin's treatment has included chiropractic treatment, physical therapy, massage therapy, acupuncture, medication, and elctro-acupuncture treatment, but nothing has provided substantial and lasting relief.  She also participated in a functional restoration program designed to teach techniques for coping with chronic pain, though her headache symptoms were so severe that she was unable to attend an entire week of the program.

**C. Administration of LTD Claim**

52.     Defendant approved Ms. Lin's claim for LTD benefits based on an April 24, 2017 date of disability, with benefits commencing on July 23, 2017, upon the completion of a 90-day elimination period.

53.     Defendant paid just 12 months of LTD benefit payments before terminating Ms. Lin's claim effective July 22, 2018.

54.     In an August 1, 2018 letter, Defendant stated it terminated Ms. Lin's LTD benefits on the grounds that she no longer met the Plan's definition of disability because she was capable of performing certain specified alternative occupations.

55.     Through counsel, Ms. Lin appealed Defendant's denial on January 24, 2019.

56.     In a letter dated February 21, 2019, Defendant reversed its decision and reinstated LTD benefits, acknowledging that Ms. Lin was in fact unable to perform any alternative occupation for which she was qualified.

57.    In or about December 2019, Defendant obtained an external medical file review of Ms. Lin's claim from Dr. Alex Mompoint.

58.    Defendant admits that the only information provided to Dr. Mompoint to review were four months of medical records covering the period June 2009 through October 2019.

59.    Defendant failed to provide Ms. Lin's November 9, 2018 declaration, a 2018 Functional Capacity Evaluation report, and Ms. Lin's prior medical records, work restriction forms, imaging reports, and previously completed peer review reports.

60.    Despite the limited records provided for his review, Dr. Mompoint articulated precise restrictions and limitations, which he said were not permanent and did not preclude full-time sedentary employment.

61.    Defendant also referred Ms. Lin's file for a Transferrable Skills Analysis on or about January 2, 2020, which, using Dr. Mompoint's findings, concluded that Ms. Lin was able to perform full-time work as a Research Associate or Compiler.

62.    For the second time in approximately a year, Defendant terminated Ms. Lin's benefits in a letter dated January 31, 2020.

63.    In its January 31 letter, Defendant stated that it was terminating Ms. Lin's benefits, effective January 30, 2020, because it had re-evaluated her claim determined that she no longer met the Plan's definition of disability.

64.    On April 29, 2020, through counsel, Ms. Lin submitted an administrative appeal of Defendant's termination of her LTD benefits.

65.    In support of her appeal, Ms. Lin submitted evidence that there had been no substantial change to her medical condition and the symptoms and limitations described in her successful January 2019 appeal were ongoing.  The medical evidence included updated medial records from her treatment provider and an updated declaration.

66.    In a letter dated July 23, 2020 Defendant upheld its decision to terminate Ms. Lin's LTD benefits.

67.    Defendant's July 23, 2020 letter stated that a medical review and Transferrable Skills Analysis found Ms. Lin had full-timework capacity as a Research Assistant, Research Associate, Computer Systems Hardware Analyst, Complier, or Administrative Assistant.

68.    Defendant's July 23, 2020 letter further stated that Ms. Lin's administrative right to review had been exhausted and she had the right to bring a civil action under section 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA).

69.    This lawsuit followed.

**D.  Plan Terms**

70.    Under the terms of the Plan, during the first 12 months for which LTD benefits are payable, a participant is deemed disabled if, "as a result of Injury or Sickness, [the participant] is unable to perform with reasonable continuity the Substantial and Material Act necessary to pursue his Own Occupation in the usual and customary way" (the "Own Occupation" standard).

71.    Under the terms of the Plan, the definition of disability changes after LTD benefits have been payable under the Plan for 12 months, at which point a participant is considered disabled if "the Covered Person is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as result of sickness or injury the Covered Person is not able to engage with reasonable continuity in any occupation in which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, station in life, and physical and mental capacity" (the "Any Occupation" standard).

72.    Ms. Lin is, and has at all relevant times been, disabled under the terms of the Plan.

73.     Under the terms of the Plan, Ms. Lin's LTD benefits are 66.67% of her pre-disability basic monthly earnings, as defined by the Plan, less offsets for other income benefits.

## V.     CAUSES OF ACTION

### COUNT I:

### Claim for Benefits Pursuant to ERISA § 502(a)(1)(B)

74.     Plaintiff incorporates Paragraphs 1 through 73 as though fully set forth herein.

75.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due under the terms of a plan, to enforce rights under the terms of a plan, and/or to clarify rights to future benefits under the terms of a plan.

76.     At all relevant times, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for LTD benefits under the Plan, and by related acts and omissions, Defendant has violated, and continues to violate, Plaintiff's right to LTD benefits.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A.     Declare that Defendant violated 29 C.F.R. § 2650.503-1 by denying Plaintiff's claim for LTD benefits under the Plan;

B.     Order Defendant to pay LTD benefits to Plaintiff pursuant to the terms of the Plan through the date judgment is entered herein, together with prejudgment interest on each and every such monthly payment through the date judgment is entered herein;

C.     Declare Plaintiff's right to reinstatement under the Plan, and her right to receive future LTD benefits pursuant to the terms of the Plan for as long as she remains disabled under the terms of the Plan;

D.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and,

E.      Provide such other relief as the Court deems equitable and just.


Dated:  January 25, 2021                    Respectfully submitted,

                                            /s/ *Jeena Jiampetti*
                                            Jeena Jiampetti
                                            SPRINGER AYENI, APLC
                                            *Attorneys for Plaintiff*